Roosevelt X. ABERNATHY, Appellant,

v.

Robert PERRY, Larry Norris, Appellees.

No. 88–1975.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 28, 1988.

Decided March 15, 1989.

Roosevelt X. Abernathy, pro se.

Steve Clark, Atty. Gen., Little Rock, Ark., for appellees.

Before BOWMAN and BEAM, Circuit Judges, and HEANEY,* Senior Circuit Judge.

HEANEY, Senior Circuit Judge.

Roosevelt X. Abernathy, an inmate at the Tucker Maximum Security Unit of the Arkansas Department of Correction, appeals from the district court order dismissing his 42 U.S.C. § 1983 action. Abernathy claimed his due process rights were violated when he was placed on investigative status[1] for thirty-five days. We affirm.

---

* The Honorable Gerald W. Heaney assumed senior status on December 31, 1988.

1. According to a policy memorandum from the Director of Prisons, A.L. Lockhart, dated June 2, 1982, regarding procedures for prisoners on investigative status, "[a]n inmate may be placed

On October 27, 1987, Abernathy was transferred from the general population and placed in the administrative segregation unit on investigative status, where he remained until December 1, 1987. He filed a complaint claiming he was not told of the reason for the detention or the suspected charge; he only received three written five-day extensions of his investigative status, none after November 16, 1987; and the Director of Prisons did not approve his detention beyond thirty days; all of which were in violation of prison regulations. He demanded a jury trial.

Appellees prison officials filed a motion to dismiss for failure to state a claim, which the district court denied. The district court, however, ordered Abernathy to appear for a hearing, together with another inmate with an identical claim, for the purpose of determining whether his case could survive a motion for a directed verdict.

At the evidentiary hearing, Robert Perry, Chief of Security Major, testified that on October 27, 1987, he received information that Abernathy and three other inmates were involved in an extortion-type racket and had threatened to kill another inmate that night. Within one hour Perry ordered all four inmates placed in lock down and their cells searched. Perry stated that the investigation lasted until December 1, 1987; no contraband was found in Abernathy's cell, nor was sufficient evidence uncovered to prove he was going to kill anyone. Perry stated he told Abernathy he was being placed on investigative status because of information Perry received that there was going to be a confrontation which could involve serious injury.

Perry explained the prison's policy concerning investigative status as set forth in a policy memorandum which provides:

1. The Shift Supervisor will authorize an inmate's placement on Investigative Status. Within forty-eight (48) hours

on Investigative Status when that inmate has violated or is suspected of violating the rules of the institution and more information is required to determine whether or not disciplinary action should be taken."

of the time an inmate is placed on Investigative Status, that inmate must either receive his/her copy of the charges against him/her or a copy of an extension of time signed by the Warden or, in his absence, the Assistant Warden. This time limit does not include the period between 6:00 p.m. Friday and 6:00 a.m. Monday. It is also exclusive of holidays.

2. An inmate on Investigative Status must receive his/her copy of the charges against him within forty-eight (48) hours of the time he is placed on Investigative Status unless an extension of time is granted by the Warden or, in his absence, an Assistant Warden following a review of that inmate's status. A copy of the extension of time shall be given to the inmate. All extensions must state a reason and specify the exact number of working days on the extension form. The extension approved by the Warden or Assistant Warden may not exceed five (5) working days per extension, and must be made for one of the reasons set out below. The Director must approve any extension over thirty (30) calendar days. There are five (5) reasons for granting extensions of time on Investigative Status, and one of these reasons must appear on the extension form. These reasons are as follows:

. . . . .

e. The case requires more extensive investigation;

Perry testified that five five-day extensions of investigative status were served on Abernathy. Perry explained that the thirty days had expired during the Thanksgiving holidays and that on November 30, 1987, Perry discussed with Warden Larry Norris taking the inmates off investigative status and splitting them up rather than getting another extension. Perry did not know who actually served the inmates with the extension notices. Norris testified that he signed five extension notices.

Abernathy testified that he did not receive a written extension notice after No-vember 16, 1987. Abernathy also testified that Perry had not informed him of the reason he was placed on investigative status, and CO-1 Johnson only told him that Perry had ordered him to be locked up.

The magistrate concluded that Abernathy had a liberty interest in remaining in the general population and not being assigned to investigative status, based on the prison policy which reflects mandatory procedures for such an assignment. He found that there may have been a failure to strictly comply with the procedures in that all of the extension notices may not have been received by Abernathy but, at most, this failure amounted to negligence or inadvertence. The district court, adopting the magistrate's recommendations, dismissed the complaint.

On appeal, Abernathy reiterates his arguments that he was denied due process when the prison did not comply with the procedures promulgated by the prison. He concedes his transfer into investigative status did not violate due process, but argues the prison's failure to give him notice extensions after November 16, 1987, until his release on December 1, 1987, and his detention for more than thirty days without approval by the Director violated his due process rights.

▊ We agree with the district court that the procedures set forth in the Director's policy memorandum gave Abernathy a liberty interest in remaining in the general population. We also agree that the requirements of this policy memorandum were substantially followed. We note the testimony that five extensions were signed, albeit not delivered, and the failure to get the Director's approval was related in part to the Thanksgiving holiday schedule. The due process clause of the fourteenth amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *accord Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

We are mindful that Abernathy was subjected to conditions of confinement more stringent than those in the general population, particularly with respect to the increased confinement in his cell, and close supervision for other activities.[2] We cannot say, however, that these conditions of confinement for this limited time rose to the level of an eighth amendment violation.

Accordingly, we affirm.

**2.** Inmates on investigative status who are housed in the Maximum Security Segregation Unit may only leave their cells under close supervision for work, recreation, and visitation, and must remain in their cells for all other activities. The privileges allowed on investigative status include:

a. Regular mail privileges;

b. Regular visiting privileges, except where such visits would endanger the security and safety of the institution;

c. A minimum of two showers per week;

d. Exercise and recreation in accordance with institutional schedule;

e. Authorized commissary items;

f. Personal items and clothing as issued to the general population or as issued to other prisoners on administrative segregation status including:

  1. State issued clothing;

  2. State issued shoes;

  3. Personal pictures and letters;

  4. Papers, pens, and pencils as approved;

  5. Bedding and linen;

  6. Toilet articles.

g. Access to reading materials and education materials;

h. Access to legal and religious materials;

i. Appointments with appropriate medical professionals when required.